Robert G. Scanlon, Acting Secretary of Education and Edward G. Biester, Jr., Acting Attorney General, Petitioners *v.* Mount Union Area Board of School Directors, Respondent.

Argued March 11, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, ROGERS, CRAIG, MACPHAIL and WILLIAMS, JR. Judge BLATT did not participate.

*Paul Schilling,* Deputy Attorney General, with him *Susan Forney,* Deputy Attorney General, *Donna Weldon,* Assistant Attorney General, *Allen Warshaw,* Chief, Civil Litigation, and *Edward G. Biester, Jr.,* Attorney General, for petitioners.

*John R. Miller, Jr.,* of *Miller, Kistler & Campbell,* for respondent.

*Michael I. Levin,* with him *William Fearen, Cleckner and Fearen,* for Pennsylvania School Boards Association, Amicus Curiae.

OPINION BY JUDGE CRAIG, April 29, 1980:

This case is before us on exceptions taken by the Secretary of Education and the Attorney General (petitioners) to the November 28, 1979 order and opinion of our late President Judge JAMES S. BOWMAN, which

dismissed petitioners' multi-count petition in the nature of mandamus, equity and declaratory judgment against respondent Mount Union Area Board of School Directors. *Scanlon v. Mount Union Area Board of School Directors*, 47 Pa. Commonwealth Ct. 409, 408 A.2d 555 (1979).

On the basis of Judge BOWMAN's opinion, we affirm his dismissal of the mandamus and equity counts, and the count characterized as Declaratory Judgment No. 2, as moot. We also concur in his reasoning and decision that the remaining declaratory judgment count is proper for disposition.

We are unable to improve on Judge BOWMAN's concise statement of the factual basis of this contest, which we quote:

The factual background . . . is uncontested. During the 1978-79 school term, Mount Union Area School District experienced a strike of its professional employees, during which strike period twenty-two (22) instructional days were lost except with respect to trainable mentally retarded pupils and those pupils who attended a vocational-technical school. Upon termination of the strike, a collective bargaining agreement was entered into. The original school calendar as adopted by respondent provided for pupil instruction to begin September 6, 1978 and to end on June 5, 1979. This calendar provided for 180 days of pupil instruction. After settlement of the strike and agreement with its professional employees, respondent on November 21, 1978, adopted a resolution calling for the revision of the original school calendar with these pertinent features: (1) no days already scheduled for Christmas vacation would be rescheduled as days of instruction; and (2) a revised school calendar would not extend beyond June 8, 1979.

The original school calendar provided for pupil instruction to end on June 5, 1979. The following day the Department of Education by one of its officials advised respondent in writing of the department's awareness of the strike and days lost thereby and of the need to afford 180 days of pupil instruction notwithstanding days lost by reason of the strike.

On January 8, 1979, respondent adopted a revised school calendar for the school year, which provided for a maximum 165 days of pupil instruction, the final day thereof being June 8, 1979. Upon receiving notice of the respondent's revised school calendar, the department promptly advised respondent that it was not in compliance with the law which the department considered as mandating 180 days of pupil instruction regardless of the disruption of the original calendar caused by the strike. Respondent declined to further revise its school calendar. Hence this suit.

47 Pa. Commonwealth Ct. at 411-12, 408 A.2d at 556-57.

The declaratory judgment count which we do address asserts that Section 1501 of the Public School Code of 1949 (Code), Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §15-1501, mandates a minimum of 180 days of instruction for pupils in each school year. Section 1501 provides:

All public kindergartens, elementary and secondary schools shall be kept open each school year for at least one hundred eighty (180) days of instruction for pupils. No days on which the schools are closed shall be counted as days taught, and no time shall be counted as a pupil session for any activity to which admission is charged. Unless otherwise provided by this act, the board of school directors in any

district or joint board may keep such other
schools or departments as it may establish open
during such time as it may direct.

Our decisions on this question are few, and have been
ably summarized in the opinion of Judge Bowman in
this case and by the late Judge Kramer in *Common-
wealth v. Mifflin County School Board*, 30 Pa. Com-
monwealth Ct. 213 (1977). Hence, only brief discus-
sion of those decisions is necessary here.

*Root v. Nothern Cambria School District*, 10 Pa.
Commonwealth Ct. 174, 309 A.2d 175 (1973) was an
appeal from a lower court's dismissal of an equity
suit to compel rescheduling of thirty instructional
days lost due to a teachers' strike in the 1972-73 school
year. The majority, in concluding that the lower court
had not abused its discretion in denying the requested
relief, and the dissenters each noted the imprecise pro-
cedural posture of the case: The majority stated that
"our review might confine itself to jurisdictional and
other procedural and technical problems in the litiga-
tion";[1] Judge Mencer noted "significant procedural
questions"[2] while dissenting on the merits; Judge
Blatt, though joining Judge Mencer's dissent, would
have dismissed the case, decided August 28, 1973, as
mooted by the expiration of the 1972-73 school year.

The issue was next before us in *Commonwealth v.
Leechburg Area School Board*, 19 Pa. Commonwealth
Ct. 140, 339 A.2d 149 (1975), a mandamus action with-
in our original jurisdiction to direct that the board
reschedule four days lost due to strike activity. In
denying the petitioners' motion for judgment on the
pleadings, the majority reiterated the standard of
*Root, supra*:

[S]chool boards must schedule 180 days of in-
struction . . . the requirement of 180 days of in-

---

[1] 10 Pa. Commonwealth Ct. at 177, 309 A.2d at 176.
[2] 10 Pa. Commonwealth Ct. at 183, 309 A.2d at 179.

struction must be adhered to unless it is impossible or impractical to do so for reasons not within the board's control . . . if it is impossible or impractical to provide the number of days required, boards must nevertheless amend their schedules so as to provide as many days as sound educational practice requires.

19 Pa. Commonwealth Ct. at 142, 339 A.2d at 150-51.

Our next exposition was in *Pittenger v. Union Area School Board*, 24 Pa. Commonwealth Ct. 442, 356 A.2d 866 (1976), where mandamus issued to compel rescheduling five strike-lost instructional days. Though unanimous in result, our court divided evenly as to the impact of the decision on *Root, supra*. Judge MENCER, joined by the late President Judge BOWMAN and Judge (now President Judge) CRUMLISH, stated that *Root* was overruled insofar as it conflicted with the holding in the case at hand; Judge WILKINSON's concurrence, joined by Judges ROGERS and BLATT, expressed that "under the facts presented here, the Board is under a clear duty to modify the previously established calendar. . . . [I]t is not only unnecessary to distinguish Root, much less overrule it, but, indeed, this decision is in entire accord." 24 Pa. Commonwealth Ct. at 449, 356 A.2d at 870. (Footnote omitted.)

Our latest foray in this area was *Commonwealth v. Mifflin County School Board*, 30 Pa. Commonwealth Ct. 213 (1977), where the late Judge KRAMER, as a hearing judge, denied peremptory judgment directing rescheduling of nineteen strike-lost instructional days. After addressing the foregoing cases, he concluded that *Union Area, supra*, was not decisional with regard to the vitality of *Root* and *Leechburg, supra*, as precedent under Section 1501.

President Judge BOWMAN, as hearing judge in the case before us, likewise concluded that *Root* and *Leechburg* remained undisturbed by *Union Area*.

Therefore he decided against petitioners on the declaratory judgment count, which sought a declaration that, as a matter of law, the 180-day requirement of Section 1501 is mandatory, not discretionary in terms of "sound educational practice" or otherwise.

Because we have not had, until now, a majority view as to the impact of our *Union Area* decision upon the *Root* case doctrine, we have decided to review the declaratory judgment count here, and to sustain the exceptions.

As President Judge Bowman noted, this court's decisions have not been unanimous; we remark further that any conflict in the decisions is not susceptible of simple articulation. However, we see the need for clarity and finality on this recurring question of considered public importance.

We here hold that the legislature has intended by the language of Section 1501 to prescribe, as a matter of statewide policy, a mandatory minimum number of days on which schools "shall be kept open," which minimum may not be obviated by other than the impossibility of compliance with that requirement within the terms of the entire School Code.

In this respect, we depart from the opinion in *Root, supra,* only insofar as it may imply that strike activity or other interruption of instruction categorically modifies the obligation of boards to provide 180 days of instruction for pupils. Just as that duty to keep the schools open is not satisfied by the mere adoption of a complying schedule, it is not relieved by disruptions in the schedule. This view comports with the thrust of the decision in *Root* that "[b]oards must schedule 180 days and provide this number . . . [unless] unavoidable cause prevents." 10 Pa. Commonwealth Ct. at 180, 309 A.2d at 178.

After study of all aspects of the problem, we are unable to conclude that a strike or other activity which

interrupts or delays an originally adopted schedule *categorically* constitutes such "circumstances not within [the board's] control" or "unavoidable cause" as to render compliance with the requirement impossible. Strike activity or other unavoidable delay or disruption of a desired adopted schedule renders compliance under the Code unavailable only when that disruption is so extensive as to preclude the possibility of 180 days of pupil instruction *within the statutory school year.*

We are buttressed in our conclusion, that Section 1501 is mandatory without qualification, by the language of that section particularly and by reading it against the backdrop of the entire Code.

As quoted above, the statute reads that "schools shall be kept open for at least one hundred eighty (180) days of instruction for pupils." It continues that, in the accounting of those days, "[n]o days on which the schools are closed shall be counted as days taught." That language plainly contrasts with the permissive language concluding the section: Boards are empowered to "keep such *other* schools or departments as it may establish open during such time as [the board] may direct." (Emphasis ours.)

This contrast is evident not only in Section 1501; the Code is replete with examples of the legislature's alternate usage of "shall" or "may" so as to differentiate those parameters of the educational system within which all boards must operate[3] from those ele-

---

[3] *See*:*E.g.*: Written contracts with professional employees, Section 1121, 24 P.S. 11-1121 (*see Gordon v. Board of Directors of West Side Area Vocational Technical School*, 21 Pa. Commonwealth Ct. 616, 347 A.2d 347 (1975)) ; Minimum salaries, Section 1142, 24 P.S. §11-1142 (*see Wildrick v. Board of Directors of Sayre Area School District*, 27 Pa. Commonwealth Ct. 612, 367 A.2d 768 (1976)) ; Prescribed courses of study, Section 1511, 24 P.S. §15-1511 (*see Ehret v. Kulpmont School District, infra*).

ments of the educational process which are within the domain of individual boards.[4]

Particularly supportive of our conclusion are Sections 520[5] and 520.1[6] of the Code, which address situations where, due to war (Section 520) or other unanticipated emergency (Section 520.1), boards may be unable to comply strictly with particular provisions of the Code. Under specified circumstances, these sections authorize boards to effectuate, on a temporary basis, certain departures from the requirements of the Code.

Importantly, however, both of those sections explicitly state that "the provisions of this Act requiring a minimum of one hundred eighty (180) session days . . . shall not be affected" by a board's election to avail itself of the provisions of either section. Thus, even in the severe circumstances described in Sections 520 and 520.1, the legislature has provided that the 180-day requirement is to remain intact.

Such provisions therefore confirm that the legislature intended the 180-day requirement to be a threshold parameter of educational policy, with deviation allowed only by the legislature. When other substantial emergencies do not detract from the requirement that the "schools shall be kept open each school year for at least one hundred eighty (180) days of instruction," we cannot conclude that the mandate is obviated by the superimposition of the right to strike on the traditional educational system.

---

[4] *See*: *E.g.*: Establishment of additional schools and departments, Section 502, 24 P.S. §5-502; Kindergartens, Section 503, 24 P.S. §5-503; Consolidation of schools, Section 505, 24 P.S. §5-505; Employment of special teachers, Section 1107, 24 P.S. §11-1107; Leave of absence and salary rules, Section 1154(e), 24 P.S. §11-1154 (e).

[5] 24 P.S. §5-520.

[6] Added by the Act of January 14, 1952, P.L. (1951) 1940, §1, 24 P.S. §5-520.1.

We find still additional support for our conclusion in recent enactments of the legislature bearing on the 180-day requirement. In the Act of June 1, 1977, P.L. 4, known as the Weather Emergency Bill, the legislature, cognizant of the disruption in school calendars caused by severe weather in the 1976-77 school year, provided for 177 days of instruction, which boards should "make every effort" to achieve. In 1979, on the heels of the Three Mile Island (TMI) incident (which closed schools proximate to the island), the legislature adopted the Act of May 11, 1979, Act No. 1979-7, P.L.    , which made allowance for a schedule of 174 days for schools within five miles of TMI and 178 for affected schools beyond five miles from TMI. Had the legislature not perceived the requirement of Section 1501 to be mandatory and alterable only by action of the General Assembly, there would have been no occasion or necessity for those actions with regard to the requirement. We should not presume the legislature to have enacted meaningless amendments.

We are aware that strike activity might lawfully continue for such a period as to render the provision of 180 instructional days impossible within the terms of the Code defining the school year; in that event, boards must amend their schedules to comply as fully as is possible within the applicable school year.

This result may indeed be inconvenient to many; however, the conflict of the traditional school schedule with the combined effect of the 180-day requirement and the rights of public employees to strike, is not so much a conflict between parties as it is a conflict in policies with enormous independent impact on the educational system. In this regard we find a judicial policy voiced by the Supreme Court in *Ehret v. Kulpmont Borough School District*, 333 Pa. 518, 5 A.2d 188 (1939) to be persuasive:

The question raised is a most serious one and affects the life of our educational system. To hold as appellee contends would place an unbearable burden throughout the State . . . but if the legislature has so commanded, . . . it is not for the courts to determine the wisdom of such policy. The Constitution has placed the educational system in the hands of the legislature, free from any interference from the judiciary save as required by constitutional limitations. We may only, in problems such as this, ascertain the legislative intent.

333 Pa. at 521-22, 5 A.2d at 190.

Although the decision in *Ehret*, which involved retention of teacher personnel when a department is abolished, was against the appellee teacher, the holding nevertheless left unshaken the stated principle of deference to the legislature in these situations.

Accordingly we will affirm dismissal of petitioners' counts in equity, mandamus and the count labeled Declaratory Judgment No. 2; we will sustain petitioners' exceptions to the dismissal of the remaining count, labeled Declaratory Judgment No. 1; and we will declare as a matter of law that Section 1501 of the Code establishes a mandatory minimum number of days on which the schools enumerated therein shall be kept open for pupil instruction within each school year, not withstanding postponement or interruption of adopted schedules by strikes or other cause.

#### ORDER

AND Now, this 29th day of April, 1980, the November 28, 1979 order of the late President Judge Bowman, dismissing petitioners' counts in equity, mandamus and the count labeled Declaratory Judgment No. 2, is affirmed; petitioners' exceptions to the dis-

missal of the remaining count, labeled Declaratory
Judgment No. 1, are sustained. It is hereby decreed
that Section 1501 of the Public School Code of 1949,
Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S.
§15-1501, establishes a mandatory minimum number
of days on which the schools enumerated therein shall
be kept open for pupil instruction within each school
year, notwithstanding postponement or interruption
of adopted schedules by strikes or other causes.

DISSENTING OPINION BY JUDGE ROGERS:

In *Root v. Northern Cambria School District,* 10
Pa. Commonwealth Ct. 174, 309 A.2d 175 (1973), we
declared that the General Assembly in providing that
"All public . . . schools shall be kept open each school
year for at least (180) days of instruction"[1] meant
that school boards must schedule and attempt to pro-
vide for school sessions of 180 days duration but that
it did not mean to require school boards to do either
the impossible or the impractical in circumstances not
within their control. In *Root* 30 instruction days had
been lost to a lawful teachers' strike, school would
have had to be held on every weekday until the end of
June to provide 180 days, and the school superintend-
ent had advised that the education of the students
would be harmed rather than served by the schedule
proposed by the plaintiff. We held that the Court of
Common Pleas of Cambria County had not abused its
discretion in denying the relief requested by the plain-
tiff. The heart of our opinion supporting the order
upholding the trial court's dismissal of the complaint
in equity is this paragraph:

> The plaintiff argues that the court below
> should have ordered the board to keep school

[1] Section 1501 of the Public School Code of 1949, Act of March
10, 1949, *as amended*, P.L. 30, 24 P.S. §15-1501.

every weekday until the end of June because Section 1501 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, 24 P.S. §15-1501, provides: 'All public . . . schools shall be kept open each schoool year for at least one hundred eighty (180) days of instruction for pupils.' . . . The Legislature's direction that schools shall be kept open 180 days of course means that school board shall schedule and attempt to provide for school sessions of this duration. Boards are not, however, thereby required to do either the impossible or the impractical in circumstances not within their control. There are many reasons why, having scheduled the required number of instructional days, the board may be unable to provide them, one of the most obvious of which is strike action by its employes sanctioned by the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, 43 P.S. §1101.101 et seq. . . . The public interest is that of conducting a good school system; not that of achieving greater participation of teachers' organizations in school policy, or that of maintaining unfettered control of school affairs by local boards of education, or that of establishing the highest or lowest possible salary schedules, or that of exempting from or imposing upon professional employes noninstructional duties, or, finally, that of nourishing or weakening employe associations. Boards must schedule 180 days and provide this number or, if unavoidable cause prevents, amend the schedule so as to provide as many days as sound educational practice would indicate. In this determination, its professional administrators' opinions should have the greatest weight.

10 Pa. Commonwealth Ct. at 178, 309 A.2d at 177.

The Pennsylvania Supreme Court denied allocatur of our decision of *Root*. Until today's decision this court has adhered to the *Root* holding, leaving the decision of the rescheduling of instructional days lost to strikes to the sound discretion of the school boards in the first instance. This resolution of the problem is reasonable; it is consistent with the legislative purpose evinced throughout the Public School Code of 1949 to leave the administration of the schools, to the local, elected school boards; and it is, therefore, what the General Assembly intended. The rule today adopted by the court has none of these characteristics and like most attempts to settle human affairs by rule without exception will probably prove to be mischievous. With respect to legislative intent, the fact that the General Assembly, although surely importuned to do so, has not intervened to alter *Root* would suggest its satisfaction with the rule there made.

The record here shows that the Mount Union School Board adopted a calendar providing for 180 days of instruction to begin September 6, 1978 and to end on June 5, 1979. Twenty-two additional days were lost in the teachers' strike. The School Board, after three weeks of consideration and on recommendation of the School Superintendent and other staff members, revised the school calendar so as to make up seven of the lost instructional days. More lost days were not made up because the school authorities concluded that the calendar should not be extended beyond June 8, 1979. This conclusion was based on facts ascertained during the time the matter was under consideration, some of the more compelling of which were: that not less than 120 students had summer employment which would be adversely affected by further extension of the calendar; that the students and the parents of students were opposed to a further extension; that local churches traditionally conducted

religious classes for the period just after school ended in June; that from 12 to 19 students had been selected to participate in a college campus program called Upward Bound beginning at the end of the originally scheduled end-of-term; that twelve students had military commitments; and that summer school for about 300 students needing remedial work was scheduled to begin within a week after June 5, 1979. The wisdom of the School Board's decision not to schedule instructional days after June 8, 1979 is unassailed and was seemingly unassailable. The folly in the face of the facts of this case of any other decision is compelling testimony that Section 1501 was never intended to be applied as the majority has here declared.

I dissent.

Judge Wilkinson, Jr., joins in this dissent.

Judge Williams, Jr., joins in this dissent.